CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

APR 09 2008

JOHN F. CORCORAN, CLERK
BY /s/ 
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SILVER RING SPLINT COMPANY,<br><br>*Plaintiff,*<br><br>v.<br><br>DIGISPLINT, INC.,<br><br>*Defendant.* | CIVIL NO. 3:06cv00065<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (docket entry no. 30). Plaintiff's motion seeks summary judgment solely on the issue of Defendant's liability for copyright infringement, as set forth in Count 1 of the Complaint. I will grant Plaintiff's motion with respect to Defendant's October 2006 website because no reasonable jury could find that the website did not infringe Plaintiff's copyright in its 1994 catalog. With respect to Defendant's other allegedly infringing works, however, I will deny summary judgment because there are genuine issues of material fact in dispute.

## I. BACKGROUND

Plaintiff Silver Ring Splint Company and Defendant Digisplint, Inc. are competitors in the business of designing, manufacturing, and selling "fine jewelry quality" finger splints made of gold or sterling silver. Although these splints are medical devices for the treatment of certain finger and hand problems related to arthritis and other conditions, they are designed to be not only therapeutically functional, but also attractive to wear.

At the heart of Plaintiff's copyright infringement claim is its 1994 sales catalog showcasing its finger splint products.[1] Plaintiff represents that it sells its products primarily through its catalogs, and that some 20,000 copies of the 1994 catalog and 35,000 copies of subsequent, derivative catalogs have been distributed to medical professionals worldwide.[2] In seeking partial summary judgment, Plaintiff identifies four works that allegedly infringe its copyright in the 1994 catalog: (1) the Digisplint website, as it existed in October 2006 ("2006 website"); (2) the Digisplint website, as it existed in September 2007 ("2007 website"); (3) a Digisplint handbill distributed at the 2006 29th Annual Meeting of the American Society of Hand Therapists; and (4) a brochure for "Digisplint Canada."

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As to materiality . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Furthermore, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 250. Summary judgment

---

[1] Although not at issue on Plaintiff's Motion for Partial Summary Judgment, the Complaint also alleges that Defendant has unlawfully copied the trade dress of Plaintiff's finger splints and has engaged in unfair competition.
[2] According to Plaintiff, "Medical [p]rofessionals size splints for their patients and order customized splints from Silver Ring's Catalogue. All of Silver Ring's products are sold through medical [p]rofessionals to the consuming patient after the patient has been evaluated and measured." (Compl. ¶ 11.)

under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See, e.g., id.* at 248–50 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir.1999).

If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

A court should grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Indeed, the nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 317).

### III. DISCUSSION

To establish Defendant's liability for copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work

that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *accord Towler v. Sayles*, 76 F.3d 579, 581 (1996). With respect to the first element, the copyright registration certificate that Plaintiff obtained in 1997 (Compl., Ex. A) constitutes prima facie evidence of Plaintiff's ownership of a valid copyright in its 1994 catalog.[3] *See* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").[4]

Thus, the burden shifts to Defendant to rebut the presumption of copyright validity created by the certificate. *See Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 688 (4th Cir. 1992) (citing 17 U.S.C. § 410(c); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986)). Defendant's only apparent argument in this regard is that "a large part of the alleged infringement relates to the copying of references to 'useful articles,' . . . the generic purpose of the splints, . . . and/or the medical conditions that are treated by such products, . . . which cannot be copyrighted." (Def.'s Resp. 10.) That useful articles and medical conditions cannot themselves be copyrighted, however, does not mean that original expression referring to such things is likewise uncopyrightable. *See, e.g., Bouchat v. Balt. Ravens, Inc.*, 241 F.3d 350, 356 (4th Cir. 2001) (holding that a drawing containing several uncopyrightable public domain elements was "entitled to copyright protection" because the elements "were selected,

---

[3] In its response to Plaintiff's Motion for Partial Summary Judgment, Defendant argues that the copyright registration certificate and the other exhibits submitted by Plaintiff are unauthenticated and therefore may not be considered. However, Plaintiff has cured this defect, if any, with authenticating affidavits filed as exhibits to its reply brief. (*See* Pl.'s Reply, Exs. 1–2.) Inasmuch as Defendant also addresses Plaintiff's motion on its merits and has raised no further objection since the filing of the affidavits, I will consider Plaintiff's exhibits to be properly before Court pursuant to Rule 56(c).

[4] Defendant misreads § 410(c) in arguing that a registration certificate constitutes prima facie evidence only in a judicial proceeding brought within five years of the copyrighted work's first publication. (*See* Def.'s Resp. 9 n.3.) To the contrary, § 410(c) requires only that the *registration* be made within five years of first publication; the timing of any judicial proceeding is irrelevant. 17 U.S.C. § 410(c); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.11[A] (2007).

coordinated, and arranged in such a way as to render the work original"). If Defendant's argument were accepted, the mere fact that one cannot copyright green eggs or ham would deprive Dr. Seuss of the copyright in his children's book that takes those items as both its title and principal subject matter. *See* Dr. Seuss, *Green Eggs and Ham* (1960). Clearly, this is not an outcome countenanced by the Copyright Act. Accordingly, Defendant fails to satisfy its burden to rebut the presumption of validity created by Plaintiff's copyright registration certificate.

The second element of copyright infringement, "copying of constituent elements of the work that are original," presents a more difficult question. *Feist Publ'ns*, 499 U.S. at 361. Given that Plaintiff does not offer the testimony of any witness to the physical act of copying, I will assume without deciding that Plaintiff's evidence does not constitute direct evidence that Defendant copied the 1994 catalog. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01[B] (2007) ("It is generally not possible to establish copying as a factual matter by direct evidence, as it is rare that the plaintiff has available a witness to the physical act of copying."). *But see M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 445–46 (4th Cir. 1986) (finding "compelling substantial direct evidence of copying" in that "[t]he similarities between the two [works] . . . are so striking that no other conclusion is possible"). "When the plaintiff possesses no direct evidence that the defendant copied its protected work, it may create a presumption of copying by indirect evidence establishing that the defendant had access to the copyrighted work and that the defendant's work is 'substantially similar' to the protected material." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001).

Defendant effectively concedes that it had access the 1994 catalog prior to the creation of its website and printed marketing materials. According to the President of Digisplint, "Digisplint was aware of Silver Ring's material and copyrights, so Digisplint hired a printing company, who

in turned [*sic*] hired a copyright specialist, who went over Silver Ring's material and created 'original' material . . . ." (Def.'s Resp., Ex. A at ¶ 6; *see also* Pl.'s Mot., Ex. A at ¶ 14.) Defendant does not dispute that "Silver Ring's material" included the 1994 catalog, nor does it otherwise dispute the question of access.[5]

Thus, Defendant's liability for copyright infringement turns on whether the allegedly infringing works are "substantially similar" to Plaintiff's 1994 catalog.

> Proving substantial similarity requires a two-part analysis. First, a plaintiff must show . . . that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection. Second, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed.

*Towler*, 76 F.3d at 583–84 (citing *Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 732–33 (4th Cir. 1990)).[6] With these standards in mind, I will address the question of substantial similarity with respect to each of the four allegedly infringing works in turn.

### A. Defendant's 2006 Website

There can be little question that Defendant's 2006 website was substantially similar to Plaintiff's 1994 catalog. Indeed, Defendant concedes that "[s]ome of the information [on the website] was almost identical to some of the information the [*sic*] Silver Ring had published years ago." (Pl.'s Mot., Ex. A at ¶ 14.) The following comparison demonstrates numerous instances of verbatim or near-verbatim copying:[7]

---

[5] Moreover, the almost verbatim copying of portions of the 1994 catalog, which is discussed in detail below, constitutes such a striking similarity that no reasonable jury could conclude that Defendant did not have access to the 1994 catalog. *See Bouchat*, 241 F.3d at 356 ("[S]triking similarity is circumstantial evidence of copying, thereby supporting an inference of access.")

[6] "Some courts use a different set of labels for the two-prong inquiry, referring to the first prong as establishment of copying and the second prong as establishment of illicit appropriation." *Dawson*, 905 F.2d at 732 n.1 (citations omitted).

[7] Capitalization, spelling, and punctuation, with the exception of ellipses, are reproduced as they appear in the originals. Although not subject to ready replication in a judicial opinion, an additional instance of clear copying is

| SILVER RING'S 1994 CATALOG (Compl., Ex. A.) | DIGISPLINT'S WEBSITE (OCT. 2006) (Compl., Ex. B.) |
|---|---|
| "For small fingers (splint size 3 1/2 or less), the Siris Swan Neck Splint can be worn upside down, with the junction of the rings on top of the finger joint, to provide extension mobilization." | "Swan Neck Splint . . . for small fingers (splint size 3 1/2 or less), it can be worn upside down, with the junction of the rings on top of the finger joint, to provide extension mobilization"[8] |
| "These splints can be adjusted to position the finger in slight flexion, which helps during the initiation of flexion and improves function." | "The splint can be adjusted to position the finger in slight flexion, which helps during the initiation of flexion and improves function." |
| "The Siris Lateral Support Splint corrects lateral deviation and blocks hyperextension of a joint, while allowing full flexion. The support between the two rings can be attached to either side of the proximal ring and is always placed on the side *opposite* the direction the finger is deviating. For example, if there is ulnar deviation of the finger, support should be placed on the radial side of the joint. If the finger is laterally unstable in both directions, support can be placed on both sides." | "the Swan Neck Lateral Support Splint corrects minor lateral deviation, supports lateral instability, and blocks hyperextension of a joint, while allowing full flexion. The support between the two rings can be attached to either side of the proximal ring and is always placed on the side opposite the direction the finger is deviating. For example, if there is ulnar deviation of the finger, support should be placed on the radial side of the joint. If the finger is laterally unstable in both directions, support can be placed on both sides." |
| "The Siris Boutonniere Splint is another option for restricting movement of the IP joint of the thumb. When the spacer is worn on top of the IP joint, flexion is blocked." | "Boutonniere Splint . . . can be used as an option for restricting movement of the IP joint of the thumb. When the spacer is worn on top of the IP joint, flexion is blocked" |
| "When flexor tendon tenosynovitis occurs in the proximal or middle phalanx, the Siris Boutonniere or Siris Realignment Splint is used to restrict flexion of the PIP joint." | "when flexor tendon tenosynovitis occurs in the proximal or middle phalanx, the boutonniere splint can be used to restrict flexion of the PIP joint" |
| "The Siris Boutonniere Splint is very effective for a mild to moderate, reducible boutonniere or mallet finger deformity (less than 25°). It can be adjusted by the wearer to hold the finger in position and provide varying degrees of extension mobilization." | "Boutonniere Splint . . . it is very effective for a mild to moderate, reducible boutonniere or mallet finger deformity (less than 25 degrees). It can be adjusted by the wearer to hold the finger in position and provide varying degrees of extension mobilization."[9] |

---

found in Defendant's "Condition Chart," which is nearly identical in text and layout to a chart found on page 14 of Plaintiff's 1994 catalog.

[8] The "Our Products" pages of Defendant's website are organized by splint type. For example, in this instance, the words "Swan Neck Splint" appear in bold type at the top of the page, followed by a succession of bullet points describing the Swan Neck Splint. (*See* Compl., Ex. B.) The use of an ellipsis in this and some subsequent quotations indicates the omission of an intervening bullet point or points.

[9] In what appears to be a typographical error, this language is duplicated on Defendant's website in both the fourth and seventh bullet points under the heading "Boutonniere Splint."

Case 3:06-cv-00065-NKM-BWC   Document 53   Filed 04/09/08   Page 7 of 15   Pageid#: 259

| | |
|---|---|
| "The Siris Realignment and Siris Boutonniere Splints, worn with the oval spacer on the side of the joint, provide the greatest leverage to correct joint deviation. These splints can be used when flexion of the joint is limited to less than 45°, but not on a finger which has full active flexion since the splint will rotate." | "Boutonniere Splint . . . when worn with the oval spacer on the side of the joint it can provide great leverage to correct a joint deviation. It can be used when flexion of the joint is limited to less than 45 degrees, but not when a finger has full active flexion since the splint will rotate." |
| "Each of these splints can be easily adjusted to accommodate minor edema changes. The splint is made looser when the two rings are squeezed together. Conversely, the splint is tightened when the two rings are spread apart." | "for changes in finger size due to swelling the splints can be adjusted.[10] The splint is made looser when the two rings are squeezed together and tightened when the two rings are spread apart." |
| "These splints can be adjusted to position the finger in slight flexion, which helps during the initiation of flexion and improves function." | "splints can also be adjusted to position the finger in slight flexion, which helps during the initiation of flexion and improves function"[11] |
| "During use, the splint can be adjusted for comfort by squeezing the rings together to allow for more flexion or spreading them apart for more extension. To put the splint on over a flexion deformity, squeeze the rings together slightly, put the splint on sideways and rotate it up over the joint." | "during use, the splint can be adjusted for comfort by squeezing the rings together to allow for more flexion of spreading them apart for more extension. To put the splint on over a flexion deformity, squeeze the rings together slightly, put the splint on sideways and rotate it up over the join." |
| "The Siris Boutonniere Lateral Support Splint provides extension mobilization and correction of lateral deviation. The lateral support can be attached to one or both sides of the proximal ring and is always placed on the side *opposite* the direction the finger is deviating." | "the Boutonniere Lateral Support Splint provides extension mobilization, supports lateral instability, and corrects lateral deviation. The lateral support can be attached to one or both sides of the proximal ring and is always placed on the side opposite the direction the finger is deviatin." |
| "To put the splint on over a flexion deformity, squeeze the rings together slightly, put the splint on sideways and rotate it up over the joint." | "can be used for a flexion deformity by squeezing the rings together slightly, putting the splint on sideways and rotating it up over the joint" |
| "The Siris Combination Swan Neck/Boutonniere Splint corrects hyperextension at the PIP joint and flexion at the DIP joint. The Siris Combination Boutonniere/Swan Neck Splint corrects a boutonniere deformity at the PIP joint and hyperextension at the DIP joint." | "Combination Swan Neck /Boutonniere . . . corrects hyperextension at the PIP joint and flexion at the DIP joint<br>"Combination Boutonniere / Swan Neck . . . corrects a boutonniere deformity at the PIP joint and hyperextension at the DIP joint" |

---

[10] As in Plaintiff's catalog, Defendant here uses the plural form "splints." Plaintiff's use of the plural form is unremarkable in that the context makes clear that Plaintiff is referring to two different splints: the Siris Swan Neck Splint and the Siris Boutonniere Splint. Defendant's use of the plural form, however, is suggestive of copying because the bullet point in which it is used ostensibly refers to only a single splint: the Boutonniere Splint.

[11] Again, Defendant's use here of the plural form "splints" in a discussion of only a single splint is suggestive of copying.

- 8 -

| | |
|---|---|
| "The Siris Buddy Ring is used at the MCP joints to align fingers that are not in the same plane. This type of deviation may arise following trauma, post polio or as the result of tendon transfers. As the name implies, the splint 'buddys up' straying fingers with a neighboring finger. It is appropriate when there is stability in an adjoining finger, but not for ulnar drift of all digits due to rheumatoid arthritis.<br>"The Siris Buddy Ring can be formed with or without an offset between the rings. 'No offset' rings are side by side, creating slight abduction of the fingers being splinted. An 'offset' (1/3, 1/2 or full offset) positions one ring proximal or distal to the other ring. This is useful to either follow the webspace of the hand or to place one ring farther from the webspace to assist with finger adduction." | "Buddy Ring Splint<br>• "is used at the MCP joints<br>• "it aligns fingers that are not in the same plane. This type of deviation may arise following trauma, post polio or as the result of tendon transfer. As the name implies, the splint 'buddys up' straying fingers with a neighbouring finger. It is appropriate when there is stability in an adjoining finger, but not for ulnar drift of all digits due to rheumatoid arthritis.<br>• "Offsets: the Buddy Ring can be formed with or without an offset between the rings. 'No offset' rings are side by side, creating slight abduction of the fingers being splinted. An 'offset' (1/3, 1/2, or full offset) positions one ring proximal or distal to the other ring. This is useful to either follow the webspace of the hand or to place one farther from the webspace to assist with finger adduction." |
| "They can prevent deformities or correct existing ones, relieve chronic pain, promote healing, provide post-surgical stabilization, or alleviate the need for costly hand surgery." | "They can prevent deformities or correct existing ones, relieve chronic pain, promote healing, provide post-surgical stabilization or alleviate the need for hand surgery." |

In addition to the foregoing examples, there are numerous other instances in Defendant's website where minor differences from Plaintiff's text might be sufficient to avoid the "verbatim" label, but which a jury could easily find to be substantially similar. Even if the inquiry were limited, however, to the instances of verbatim or near-verbatim similarity set forth above, no reasonable jury could find that Plaintiff's 1994 catalog and Defendant's website are not substantially similar. The extrinsic and intrinsic prongs of the substantial similarity analysis consider the substantial similarity of the works' ideas and expression of those ideas, respectively. *Towler*, 76 F.3d at 583–84. With the sort of verbatim or "literal" similarity presented here, however, "it is not necessary to determine the level of abstraction at which similarity ceases to consist of an 'expression of ideas,' because literal similarity by definition is always a similarity as to the expression of ideas."[12] 4 *Nimmer, supra*, § 13.03[A][2].

---

[12] In an effort to add clarity to what is often a confusing concept, *Nimmer on Copyright* distinguishes between two general types of substantial similarity: "comprehensive nonliteral similarity" and "fragmented literal similarity." *See* 4 *Nimmer, supra*, § 13.03[A][1]–[2]. Comprehensive nonliteral similarity "is the situation where there is

Case 3:06-cv-00065-NKM-BWC Document 53 Filed 04/09/08 Page 9 of 15 Pageid#: 261

Moreover, no member of the works' intended audience of medical professionals and persons in need of finger splints could reasonably decide that the expression of ideas in the two works is not substantially similar. True, there is little similarity in the photographs, layout, and other visual aspects of the two works. Yet the almost word-for-word copying of Plaintiff's text is so obvious and pervasive that the intended audience could not help but notice the substantial similarity despite any lack of similarity in some other respects.[13]

Of course, Defendant is free to copy, even word-for-word, elements of Plaintiff's 1994 catalog that are not original. *See Feist Publ'ns, Inc.*, 499 U.S. at 361. As previously discussed, Defendant has failed to meet its burden to rebut the presumption of originality that applies to Plaintiff's catalog as a whole by virtue of the copyright registration certificate. With respect to the specific portions of the catalog that were copied almost verbatim, Defendant is no doubt correct that certain words and phrases in Plaintiff's catalog cannot be considered "original," such

---

comprehensive similarity but no word-for-word or other literal similarity—what the Second Circuit terms 'inexact-copy infringement.'" *Id.* § 13.03[A][1]. It exists where there is "a similarity not just as to a particular line or paragraph or other minor segment, but where the fundamental essence or structure of one work is duplicated in another." *Id.* However, "if the only similarity between [the] works is that of [an] abstract idea, there is an absence of substantial similarity and hence, no infringement results." *Id.*

Fragmented literal similarity exists "[w]here there is literal similarity (virtually, though not necessarily, completely word for word) between [the] works," but such literal similarity is "fragmented." *Id.* § 13.03[A][2]. In other words, "the fundamental substance, or skeleton or overall scheme . . . has not been copied; no more than a line, or a paragraph, or a page or chapter of the copyrighted work has been appropriated," but it has been appropriated virtually verbatim. *Id.*

Unlike the instant case of fragmented literal similarity between Plaintiff's 1994 catalog and Defendant's website, all of the Fourth Circuit cases applying the extrinsic/intrinsic approach appear to have dealt with alleged similarities best characterized as comprehensive and nonliteral. *See Lyons P'ship*, 243 F.3d 789; *Towler*, 76 F.3d 579; *Dawson*, 905 F.2d 731. This is not to say that the extrinsic/intrinsic approach has no place in the analysis of fragmented literal similarity; however, inasmuch as "literal similarity by definition is always a similarity as to the expression of ideas," 4 *Nimmer, supra*, § 13.03[A][2], it would seem that, to at least some extent, the inquiries into similarity of ideas and of expression of ideas must necessarily merge.

[13] The only other examples of dissimilarity that Defendant offers are the use of the word "will" rather than "can" in some instances, and the fact that Defendant's website is organized by splint type (e.g., Swan Neck Splint, Boutonniere Splint, etc.), whereas Plaintiff's catalog is organized by infirmity (e.g., hyperextension, lateral instability, etc.). (*See* Def.'s Resp. 8.) The former example is merely indicative of what appears to have been Defendant's overall effort "to appropriate the plaintiff's [text] . . . by frivolous variation," which, "in itself, constitutes compelling evidence of copying." *M. Kramer Mfg.*, 783 F.2d at 446 (quoting *Tenn. Fabricating Co. v. Moultrie Mfg. Co.*, 421 F.2d 279, 284 (5th Cir. 1970)). The difference in the organization of the two works is more helpful to Defendant's cause but is not so significant that it could distract a reasonable member of the intended audience from entire paragraphs of text that are virtually identical in both works.

as the name "Swan Neck Splint," which simply describes a splint used to treat a swan neck deformity. (*See* Def.'s Resp. 7, 10.) This does not mean, however, that any copied portions of Plaintiff's catalog that contain unoriginal words or phrases are themselves unoriginal. In *Feist Publications*, where the issue was the originality of a phone book's use of the unoriginal facts of persons' names, towns, and telephone numbers, the Supreme Court explained:

> The question that remains is whether [the appellee] selected, coordinated, or arranged these uncopyrightable facts in an original way. As mentioned, originality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way. It is equally true, however, that the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist. As this Court has explained, the Constitution mandates some minimal degree of creativity, and an author who claims infringement must prove "the existence of . . . intellectual production, of thought, and conception."

*Feist Publ'ns, Inc.*, 499 U.S. at 362 (citations omitted).

In *Feist Publications*, the Court found that this "low" standard was not satisfied because the appellee "simply [took] the data provided by its subscribers and list[ed] it alphabetically by surname. The end product [was] a garden-variety white pages directory, devoid of even the slightest trace of creativity." *Id.* In contrast, the selection and arrangement of both original and unoriginal elements in the copied portions Defendant's catalog clearly exhibit more than a "minimal degree of creativity." Though no doubt driven in part by functional considerations, the catalog's descriptions of Plaintiff's products are essentially advertising copy that is capable of being expressed in any number of ways. The expression chosen by Plaintiff is not "so mechanical or routine as to require no creativity whatsoever." *Id.* Accordingly, the "constituent elements" of Plaintiff's catalog at issue here are sufficiently original to satisfy the constitutional mandate. *Id.* at 361.

- 11 -

Case 3:06-cv-00065-NKM-BWC   Document 53   Filed 04/09/08   Page 11 of 15   Pageid#: 263

Defendant's final effort to avoid liability for copyright infringement is, in essence, a claim of "innocent infringement." Defendant claims that "[u]nbeknownst to Digisplint, some of the information published on the website was not that which was supposed to have been printed. . . . The mistake was completely unintentional." (Def.'s Resp., Ex. A at ¶ 7.) However, "[w]hile the defense of innocent infringement can impact the remedies available against a defendant for copyright infringement, it 'will not constitute a defense to a finding of liability.'" *Phoenix Renovation Corp. v. Rodriguez*, 439 F. Supp. 2d 510, 517 (E.D. Va. 2006) (quoting 4 *Nimmer, supra*, § 13.08). Inasmuch as Plaintiff seeks summary judgment only on the issue of liability, this defense need not be considered in the present context.

In sum, with respect to Defendant's 2006 website, no reasonable jury could return a verdict for Defendant on the issue of liability for copyright infringement. Accordingly, Plaintiff is entitled to summary judgment on that issue.

### *B. Defendant's 2007 Website*

According to Defendant, "Digisplint did not know that any Silver Ring material was on its website until it was informed by its attorney on December 13, 2006." (Def.'s Resp., Ex. A at ¶ 9.) After being so informed, Defendant "pulled the website offline" and "effectively 'destroyed' those parts of its website that contained language similar to Silver Ring's 1994 catalogue." (*Id.*; *see also* Pl.'s Mot., Ex. A at ¶ 14.) Plaintiff contends, however, that despite Defendant's changes, the website continues to infringe Plaintiff's copyright. In support of this contention, Plaintiff offers a copy of Defendant's website as it existed on September 26, 2007. (*See* Pl.'s Mot., Ex. B.)

In comparing Plaintiff's 1994 catalog and Defendant's 2007 website, a reasonable jury could easily find that they are substantially similar. This is especially true given that

dissimilarities that "appear quite obviously to be the result of a studied effort to make minor distinctions between the two works" are themselves "compelling evidence of copying." *M. Kramer Mfg.*, 783 F.2d at 446 (citing *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 618 (7th Cir. 1982); *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 146 (2d Cir. 1956)). "On the other hand, . . . a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work that would otherwise be regarded as substantially similar to plaintiff's." *Nimmer, supra*, § 13.03[B][1][b]. Moreover, some degree of minor similarity is likely unavoidable given that both Plaintiff's text and Defendant's text are, at least to some extent, dictated by functional considerations.

There can be little question that much of the text of the revised website continues to be, at the least, very much "inspired" by text from Plaintiff's 1994 catalog. I cannot say, however, that the changes Defendant has made to Plaintiff's text are so meager and insignificant that a jury would clearly be unreasonable in returning a verdict for Defendant. Thus, there is a genuine issue of material fact as to the substantial similarity of Plaintiff's 1994 catalog and Defendant's 2007 website. Accordingly, I must deny Plaintiff's motion for partial summary judgment with respect to Defendant's 2007 website.

*C. Defendant's Handbill*

Plaintiff also alleges that a handbill published by Defendant (*see* Compl., Ex. D) infringes Plaintiff's copyright in its 1994 catalog. The same considerations that apply to Defendant's revised website also apply to the handbill. Although there are marked similarities between the two works, I cannot say with certainty that no reasonable jury could return a verdict for Defendant. Accordingly, I must deny Plaintiff's motion for partial summary judgment with respect to the handbill.

- 13 -

### D. The "Digisplint Canada" Brochure

A cursory review of the "Digisplint Canada" brochure (*see* Compl., Ex. C) reveals that the large majority of its text is lifted almost verbatim from Plaintiff's 1994 catalog. According to the affidavit of Digisplint, Inc.'s president, however, the brochure "is not 'Digisplint's printed material'. [It] was the very first brochure made up for 'Digisplint Canada' in the late 1990's. Digisplint Canada dissolved in January of 2004 . . . . 'Digisplint Inc.' was created in February of 2004. Digisplint did not create and never used [the brochure]." (Def.'s Resp., Ex. A at ¶ 12 (punctuation as in original).) Thus, Defendant has raised a genuine issue of material fact as to its liability for any infringement arising from the brochure. Furthermore, it would not be proper to render judgment on the liability of an entity that is not a party to this action.

Plaintiff may well be able to show at trial that Defendant is legally responsible for any infringement arising from the brochure.[14] At this time, however, the only evidence before the Court is the sworn statement that Defendant "did not create and never used" the brochure. Accordingly, I must deny Plaintiff's motion for partial summary judgment with respect to the "Digisplint Canada" brochure.

### IV. CONCLUSION

For the foregoing reasons, I will enter an Order granting in part and denying in part Plaintiff's Motion for Partial Summary Judgment on the issue of Defendant's liability for copyright infringement (docket entry no. 30). I will grant Plaintiff's motion with respect to

---

[14] Certainly, Defendant has not elsewhere raised any distinction between "Digisplint, Inc.," and "Digisplint Canada," which it claims dissolved in 2004. Indeed, other statements by Defendant in the record imply the existence of a single continuous entity. (*See, e.g.*, Pl.'s Mot., Ex. A at ¶ 14 ("Previous to November of 2001, Digisplint made its own brochures by computer. . . . It was not until December of 2006 when Silver Ring filed suit against Digisplint that Digisplint realized that some of the information on the website was not that which was supposed to be printed."); Def.'s Resp., Ex. A at ¶ 2 (stating simply that "Digisplint was formed in 1996," with no mention of "Digisplint Canada").)

Defendant's 2006 website and deny the motion with respect to the other three allegedly infringing works.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this ____ day of April, 2008.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE