CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

JUN 1 8 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SILVER RING SPLINT COMPANY, | CIVIL NO. 3:06cv00065 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| DIGISPLINT, INC., | |
| *Defendant.* | JUDGE NORMAN K. MOON |

This matter is before the Court following a bench trial that was held on April 28, 2008. Plaintiff Silver Ring Splint Company ("Silver Ring") claims that Defendant Digisplint, Inc. ("Digisplint) infringed Silver Ring's copyright in its 1994 sales catalog.[1] Digisplint counterclaims that Silver Ring's registration of the internet domain name "www.digisplint.com" constitutes "cybersquatting" in violation of 15 U.S.C. § 1125(d) and uses Digisplint's name without consent in violation of Va. Code Ann. § 8.01-40.[2]

On April 9, 2008, I granted summary judgment in favor of Silver Ring as to Digisplint's liability for copyright infringement arising from Digisplint's website as it existed in October 2006.[3] At trial, Silver Ring elected to recover statutory damages instead of actual damages and profits, pursuant to 17 U.S.C. § 504(c). Digisplint, however, has not elected to recover statutory damages under 15 U.S.C. § 1117(d) for Silver Ring's alleged cybersquatting. Thus, the following issues remain for adjudication: (1) the amount of statutory damages and other relief for

---

[1] On Silver Ring's motion, its claims for trade dress infringement and unfair trade practices were dismissed without prejudice on April 24, 2008.

[2] At trial, Digisplint moved to dismiss without prejudice its counterclaims for tortious interference and defamation, which motion is hereby GRANTED.

[3] The findings of fact and conclusions of law contained in the Court's April 9, 2008 Memorandum Opinion are hereby incorporated by reference into those set forth below.

Digisplint's infringement arising from its October 2006 website; (2) Digisplint's liability and the amount of statutory damages and other relief for other allegedly infringing publications; and (3) Silver Ring's liability and the amount of profits, actual or nominal damages, and other relief for its alleged cybersquatting and use of Digisplint's name without consent. Now, having heard and carefully considered the evidence, I will set forth my findings of fact and conclusions of law, and will render a judgment thereon.

## I. FINDINGS OF FACT[4]

1.      Silver Ring is a Virginia corporation whose principal place of business is in Charlottesville, Virginia. Silver Ring was formed in 1985 and is owned by Cynthia Garris. Her husband, Edward Garris, is Silver Ring's vice-president.

2.      Digisplint is a Canadian corporation whose principal place of business is in Exeter, Ontario, Canada. Digisplint was formed in 1996 and is owned by Derek Bakelaar and his wife.

3.      Silver Ring and Digisplint are competitors in the business of designing, manufacturing, and selling "fine jewelry quality" finger splints made of gold or sterling silver. These splints are medical devices for the treatment of certain finger and hand problems related to arthritis and other conditions. They are designed to be not only therapeutically functional, but also attractive to wear.

4.      At trial, the only witnesses were Edward Garris and Derek Bakelaar. Garris' testimony was consistent throughout and was generally consistent with the other evidence. Moreover, he was unequivocal even when his testimony tended to weaken Silver Ring's position. In contrast, Bakelaar's testimony was not entirely consistent and was, overall, less

_____

[4] Any conclusion of law that is deemed to be a finding of fact is incorporated in this section by reference.

Case 3:06-cv-00065-NKM-BWC   Document 69   Filed 06/18/08   Page 2 of 18   Pageid#: 414

credible. Of particular note was Bakelaar's claim that he invented the sizing device that Digisplint used until 2004. After he was confronted with Silver Ring's virtually identical sizing device, which pre-dated Digisplint's device by at least six years, Bakelaar admitted that Digisplint's device was a copy of Silver Ring's device. Furthermore, on at least one occasion, Bakelaar's testimony as to his recollection of events, which tended to support his position, was subsequently shown and admitted to be incorrect. Additionally, in light of all the other evidence, it is difficult to believe Bakelaar's testimony as to his complete ignorance of any infringing similarity between Digisplint's publications and Silver Ring's 1994 catalog.

*A. Copyright Infringement*

5.      Copies of Silver Ring's 1994 catalog contain a copyright notice consisting of the symbol ©, the year of first publication of the catalog, and the name of the copyright owner. (Ex. 4 at 15.) The notice is affixed to the last page of the catalog. (*Id.*)

6.      In 1997, Silver Ring registered its copyright in the 1994 catalog and obtained a certificate of registration from the U.S. Register of Copyrights, which constitutes prima facie evidence of Plaintiff's ownership of a valid copyright in its 1994 catalog. (Ex. 5.) Digisplint failed to rebut this presumption of validity.

7.      In June 1998, Derek Bakelaar, the President and co-owner of Digisplint, attended a World Federation of Occupational Therapy conference in Montreal, Quebec, Canada. It was at this conference that Bakelaar first met the Garrises.

8.      As Bakelaar acknowledged at trial, Plaintiff's Exhibit 6 is a copy of the literature that Digisplint distributed at the 1998 conference in Montreal ("1998 literature").

9.      Digisplint had access to Silver Ring's 1994 catalog and first gained such access sometime prior to the 1998 conference in Montreal.

Case 3:06-cv-00065-NKM-BWC   Document 69   Filed 06/18/08   Page 3 of 18   Pageid#: 415

10.     Digisplint's 1998 literature is substantially similar to Silver Ring's 1994 catalog.

     (a)     On the page titled "Digisplint Swan Neck Splint" (Ex. 6 at 1), the 3rd and 5th bullet points are nearly identical to text on catalog pages 5 and 3, respectively.  The second sentence of the 6th bullet point is nearly identical to text on catalog page 3.

     (b)     On the page titled "Digisplint Boutonniere Splint" (Ex. 6 at 2), the 2nd, 3rd, 5th, 6th, 7th, and 8th bullet points are nearly identical to text on catalog pages 3, 4, 9, 3, 3, and 5, respectively.  The paragraph between the 5th and 6th bullet points is nearly identical to text on catalog page 5.

     (c)     On the page titled "Digisplint Realignment Splint" (Ex. 6 at 3), the 1st, 2nd, 3rd, and 4th bullet points are nearly identical to text on catalog pages 4, 4, 5, and 9, respectively.  The two paragraphs below the 4th bullet point are nearly identical to text on catalog page 5.

     (d)     On the page titled "Digisplint Swan Neck Lateral Support Splint" (Ex. 6 at 4), the 2nd and 3rd bullet points are nearly identical to text on catalog pages 4 and 7, respectively.

     (e)     On the page titled "Digisplint Boutonniere Lateral Support Splint" (Ex. 6 at 5), the 2nd bullet point is nearly identical to text on catalog page 4.

     (f)     Except for the heading containing Digisplint's contact information, the text on the page titled "Digisplint Combination Splints" (Ex. 6 at 6), is nearly identical to text on catalog page 10.

     (g)     On the page titled "Digisplint Buddy Ring" (Ex. 6 at 7), all three bullet points are nearly identical to text on catalog page 6.

(h)     The chart on the page titled "Splint Usage Chart" (Ex. 6 at 8) is nearly identical to the chart on catalog page 14.

(i)     Taken together, the nearly identical text comprises the large majority of Digisplint's 1998 literature and a substantial portion of Silver Ring's catalog.

(j)     The almost word-for-word similarity is so obvious and pervasive that the intended audience of medical professionals and persons in need of finger splints could not help but notice the substantial similarity.

(k)     The expression of ideas in the duplicated portions of Silver Ring's catalog is not so mechanical or routine as to require no creativity whatsoever and therefore exhibits at least a minimal degree of creativity.

11.     Digisplint first published its website at www.digisplint.ca in 1999.

12.     Digisplint's website as it existed in December 2007 (Ex. 8) is substantially similar to Silver Ring's 1994 catalog.

(a)     Under the heading "DS Anti-Swan Neck Splint" (Ex. 8 at 2), the 3rd, 5th, and 6th bullet points are nearly identical or very similar to text on catalog pages 5, 3, and 3, respectively.

(b)     Under the heading "DS Anti-Swan Neck Lateral Support Splint" (Ex. 8 at 2), the 2nd and 3rd bullet points are nearly identical or very similar to text on catalog page 4.

(c)     Under the heading "DS Anti-Boutonniere Splint" (Ex. 8 at 3), the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, and 9th bullet points are nearly identical or very similar to text on catalog pages 3, 8, 4, 9, 5, 3, 5, and 5, respectively.

(d)      Under the heading "DS Anti-Boutonniere Lateral Support Splint" (Ex. 8 at 3), the 2nd and 3rd bullet points are nearly identical or very similar to text on catalog page 4.

(e)      Under the heading "DS Realignment Splint" (Ex. 8 at 4), the 2nd, 3rd, 4th, 5th, 6th, and 7th bullet points are nearly identical or very similar to text on catalog pages 4, 4, 5, 9, 5, and 5, respectively.

(f)      The text of the page addressing combination splints (Ex. 8 at 5) is nearly identical or very similar to text on catalog page 10.

(g)      Under the heading "DS Buddy Ring Splint" (Ex. 8 at 6), the 1st, 2nd, and 3rd bullet points are nearly identical or very similar to text on catalog page 6.

(h)      Under the heading "DS Buddy Ring Offsets" (Ex. 8 at 6), all three bullet points are nearly identical or very similar to text on catalog page 6.

(i)      The chart in the electronic brochure that is part of Digisplint's website (Ex. 6 at 15) is nearly identical to the chart on catalog page 14.

(j)      The descriptions of Digisplint's products that are contained in the electronic brochure (Ex. 6 at 16) are nearly identical to those contained in the website proper and are to the same extent nearly identical or very similar to the text of Silver Ring's catalog.

(k)      To the extent that some of the foregoing similarities from Digisplint's website are less than "nearly identical" to Silver Ring's catalog, almost all of the dissimilarities appear quite obviously to be the result of a studied effort to make minor distinctions between the two works.

- 6 -

(l)     Taken together, the nearly identical and very similar text comprises substantial portions of both Digisplint's website and Silver Ring's catalog.

(m)     The similarity between the website and the catalog is so obvious and pervasive that the intended audience of medical professionals and persons in need of finger splints could not help but notice the substantial similarity.

(n)     The expression of ideas in the duplicated portions of Silver Ring's catalog is not so mechanical or routine as to require no creativity whatsoever and therefore exhibits at least a minimal degree of creativity.

13.     The two handbills in Digisplint's measuring kit (Ex. 10) are substantially similar to Silver Ring's 1994 catalog.

(a)     On the handbill titled "Digisplint: Now available to the U.S.A.!," the 3rd, 4th, 5th, 8th and 9th bullet points are nearly identical or very similar to text on catalog pages 5, 3, 3, 4, and 4, respectively.

(b)     On the other handbill, the 3rd, 5th, 6th, and 8th bullet points are nearly identical or very similar to text on catalog pages 5, 3, 3, and 4, respectively.

(c)     To the extent that some of the foregoing similarities from Digisplint's handbills are less than "nearly identical" to Silver Ring's catalog, almost all of the dissimilarities appear quite obviously to be the result of a studied effort to make minor distinctions between the two works.

(d)     Taken together, the nearly identical and very similar text comprises substantial portions of both Digisplint's website and Silver Ring's catalog.

- 7 -

(e)     The similarity between the website and the catalog is so obvious and pervasive that the intended audience of medical professionals and persons in need of finger splints could not help but notice the substantial similarity.

(f)     The expression of ideas in the duplicated portions of Silver Ring's catalog is not so mechanical or routine as to require no creativity whatsoever and therefore exhibits at least a minimal degree of creativity.

14.     Digisplint's business is premised on the copying of Silver Ring's intellectual property.[5] The very first splint Bakelaar made was a copy of a Silver Ring splint, the sizing device that Digisplint used until 2004 was a copy of Silver Ring's sizing device, and Digisplint's early marketing materials were copied almost verbatim from Silver Ring's catalog. Digisplint believed that Silver Ring was its only competitor.

15.     At the 1998 conference in Montreal, Garris verbally notified Bakelaar that Digisplint's 1998 literature was copied from Silver Ring's catalog in violation of Silver Ring's copyright. However, at no time prior to the filing of the instant lawsuit in December 2006, did Silver Ring send Digisplint a cease and desist letter or otherwise provide written notice that any Digisplint publication infringed Silver Ring's copyright.

16.     In December 2006, after the instant lawsuit was filed, Digisplint made some minor alterations to its website. Despite these alterations, the website continued to be substantially similar to Silver Ring's 1994 catalog.

17.     On March 1, 2007, counsel for Silver Ring filed an affidavit describing with specificity those parts of Digisplint's post-December 2006 website that Silver Ring claimed were

_____

[5] This is not to say, however, that all of Digisplint's copying has necessarily been unlawful or otherwise improper.

- 8 -

still copied virtually verbatim from Silver Ring's catalog. Digisplint continued to publish its substantially similar website until at least December 2007.

18.   Digisplint's claim that it did not know, prior to the filing of the instant lawsuit, that its website contained any material copied from Silver Ring's catalog is not credible. If the claim is true, Digisplint's ignorance can only be reasonably attributed to willful blindness.

19.   In no year since its formation has Digisplint been profitable. Digisplint would have been even less profitable had it incurred the additional expense necessary to produce marketing materials that are not substantially similar to Silver Ring's catalog. There is no evidence, however, as to the probable amount of such additional expense.

20.   Between 2004 and 2007, Digisplint had total revenues of approximately $200,000. Silver Ring's claim that the splint sales comprising those revenues would have all gone to Silver Ring had they not gone to Digisplint is not supported by the evidence. While at least some of those sales would likely have gone to Silver Ring, others might have gone to traditional splint-makers or might not have occurred at all.

21.   Digisplint markets its products primarily, if not exclusively, through its website and its measuring kits, and at least some portion of Digisplint's sales is doubtlessly attributable to those marketing tools. There is no evidence, however, by which any particular sales or amount of revenues can be attributed to either.

### B. Use of Name Without Consent and Cybersquatting

22.   Silver Ring registered the internet domain name "digisplint.com" in July 1998, shortly after the conference in Montreal. Thus, the registration occurred prior to the November 29, 1999 enactment date of the Anticybersquatting Consumer Protection Act (ACPA).

Case 3:06-cv-00065-NKM-BWC   Document 69   Filed 06/18/08   Page 9 of 18   Pageid#: 421

23.    At the time Silver Ring registered the digisplint.com domain name, Digisplint owned the distinctive mark "DIGISPLINT," which it first used in 1997.  In March 2007, Digisplint obtained a Certificate of Registration from the U.S. Patent and Trademark Office (USPTO) for the DIGISPLINT mark.  There is no evidence that the USPTO, before granting registration, required Digisplint to prove secondary meaning.  Silver Ring offered no evidence to rebut the validity and protectibility of Digisplint's mark.

24.    The domain name digisplint.com is identical or confusingly similar to the DIGISPLINT mark.

25.    Silver Ring did not obtain Digisplint's consent to use its mark in a domain name.

26.    There is no evidence that Silver Ring believed or had reasonable grounds to believe that its registration of digisplint.com was a fair use of Digisplint's mark or was otherwise lawful.

27.    Silver Ring registered digisplint.com to prevent Digisplint from using that domain name in commerce.

28.    Silver Ring has no trademark or other intellectual property rights in the DIGISPLINT mark or in the domain name "digisplint.com."

29.    The domain name digisplint.com does not consist of the legal name or a name that is commonly used to identify Silver Ring.

30.    There is no evidence that Silver Ring ever used the domain name "digisplint.com."

31.    Silver Ring did not operate a website using the domain name "digisplint.com."

32.    Silver did not offer to transfer, sell, or otherwise assign the domain name to Digisplint or any third party.

- 10 -

33.     There is no evidence that Silver Ring provided false contact information when applying for the registration of "digisplint.com."

34.     There is no evidence that Silver Ring registered or acquired multiple domain names.

35.     Although the DIGISPLINT mark is distinctive, it is not famous within the meaning of 15 U.S.C. § 1125(c)(1).

## II. CONCLUSIONS OF LAW[6]

### A. Copyright Infringement

1.     Silver Ring owns a valid copyright in its 1994 catalog.

2.     The copyright notice affixed to the last page of Silver Ring's catalog satisfies the requirements of 17 U.S.C. § 401. *See* 17 U.S.C. § 401(b)–(c); *see also* 37 C.F.R. § 201.20(d)(4), (6). Therefore, "no weight shall be given to [Digisplint's] defense based on innocent infringement in mitigation of actual or statutory damages." 17 U.S.C. § 401(d).

3.     The dissimilarities between Digisplint's infringing materials and Silver Ring's catalog that "appear quite obviously to be the result of a studied effort to make minor distinctions between the two works" are themselves "compelling evidence" that Digisplint copied Silver Ring's catalog. *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 446 (4th Cir. 1986) (citing *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 618 (7th Cir. 1982); *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 146 (2d Cir. 1956)).

4.     Digisplint's 1998 literature infringes Silver's Ring's copyright in its 1994 catalog.

5.     Digisplint's December 2007 website infringes Silver's Ring's copyright in its 1994 catalog.

---

[6] Any finding of fact that is deemed to be a conclusion of law is incorporated in this section by reference.

Case 3:06-cv-00065-NKM-BWC   Document 69   Filed 06/18/08   Page 11 of 18   Pageid#: 423

6.     The handbills in Digisplint's measuring kit infringe Silver's Ring's copyright in its 1994 catalog.

7.     Although Digisplint committed multiple infringements of Silver Ring's copyright in its 1994 catalog, Silver Ring is only entitled to a single statutory damages award. 17 U.S.C. § 504(c)(1); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[E][2] (2007).

8.     For copyright infringement that is not committed "willfully," the copyright owner is entitled to "an award of statutory damages . . . in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1).

9.     Digisplint's infringement of Silver Ring's copyright was committed with reckless disregard and/or willful blindness toward Silver Ring's rights, and was therefore committed "willfully" under 17 U.S.C. § 504(c)(2). *See Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003); *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995); *N.A.S. Imp. Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001)). Accordingly, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2).

10.     After consideration of the relevant factors, an award of statutory damages in the amount of $30,000 is just. *See Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496–97 (4th Cir. 1996) (discussing the factors relevant to the determination of statutory damages for willful infringement). Digisplint reaped no profits, but its infringements did help limit its losses. Moreover, some portion of Digisplint's 2004–2007 revenues of approximately $200,000 would have accrued to Silver Ring if not for Digisplint's infringement.

- 12 -

Although the lack of evidence as to any specific sums mitigates against an award approaching

the statutory maximum of $150,000, the willfulness of Digisplint's infringement merits an award

that is likely to have a substantial deterrent effect. These circumstances, as well as others

described in the Findings of Fact, justify a statutory damages award in the amount of $30,000.

11.      Silver Ring is also entitled to injunctive relief. Silver Ring appears to concede

that Digisplint's website is no longer infringing. However, as the Fourth Circuit has explained:

> "[I]t is well established that the voluntary discontinuance of challenged activities
> by a defendant does not necessarily moot a lawsuit." That rule is subject to the
> caveat that an injunction is unnecessary when "there is *no* reasonable expectation
> that the wrong will be repeated." But this exception is just that—an exception—
> and defendants "face a heavy burden to establish mootness in such cases because
> otherwise they would simply be free to 'return to [their] old ways' after the threat
> of a lawsuit has passed."

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) (citations

omitted). Digisplint has not satisfied its "heavy burden to establish mootness." *Id.* Accordingly,

Digisplint will be permanently enjoined, pursuant to 17 U.S.C. § 502, from infringing Silver

Ring's copyrights.

### B. Use of Name Without Consent and Cybersquatting

12.      Digisplint is not a "person" under Va. Code § 8.01-40, which provides a cause of

action to "[a]ny person whose name, portrait, or picture is used without . . . written consent."

Although the term "person" in a statute may often refer to both natural persons and corporations,

the text of § 8.01-40 makes clear that this statute applies only to natural persons. Most notably,

the statute twice addresses the possibility that the "person" is dead. Moreover, in describing the

party entitled to sue, the statute refers only to a "person," but in describing the parties subject to

suit, the statute makes explicit the distinction between a "person, firm, or corporation."

- 13 -

Accordingly, because Digisplint is not a natural person, its claim under § 8.01-40 must be dismissed.

13.    Silver Ring registered the domain name digisplint.com with "a bad faith intent to profit from [the DIGISPLINT] mark." 15 U.S.C. § 1125(d)(1)(A)(i). The cybersquatting statute sets forth nine non-exclusive factors that a court may consider in "determining whether a person has a bad faith intent."[7] *Id.* § 1125(d)(1)(B)(i). As set forth in the findings of fact, the first, second, third, and fourth factors favors Digisplint's claim that Silver Ring registered digisplint.com with a bad faith intent to profit, and the ninth factor favors neither party. Thus, the nine factors are more or less evenly balanced. The statute makes explicit, however, that the nine factors are not the only relevant factors a court may consider in determining whether a

_____

[7] The nine factors that a court may consider "[i]n determining whether a person has a bad faith intent" are:

    (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
    (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
    (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
    (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
    (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
    (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
    (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
    (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
    (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

- 14 -

person had a bad faith intent to profit. *See id.* Weighing heavily in Digisplint's favor is the fact that Silver Ring registered digisplint.com for the express purpose of keeping Digisplint—Silver Ring's primary and, perhaps, only competitor—from using that domain name. As the Second Circuit explained after discussing the nine statutory factors in *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir. 2000):

> The most important grounds for our holding that Sporty's Farm [a wholly owned subsidiary of Omega Engineering, Inc.] acted with a bad faith intent, however, are the unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute. We know from the record and from the district court's findings that Omega planned to enter into direct competition with Sportsman's [the owner of the "sporty's" mark] in the pilot and aviation consumer market. . . . It cannot be doubted, as the court found below, that Omega registered sportys.com for the primary purpose of keeping Sportsman's from using that domain name.

*Id.* at 499. Likewise, Silver Ring's intent to harm Digisplint by preventing it from using the digisplint.com domain name is substantial evidence of Silver Ring's bad faith intent to profit. Although Silver Ring may not have intended to profit directly by its own use of the digisplint.com domain name, it did intend to profit indirectly by harming its competitor. Taken together with the four statutory factors favoring its claim, it is clear that Digisplint has more than satisfied its burden of proving that Silver Ring registered the digisplint.com domain name with the bad faith intent to profit from the DIGISPLINT mark.

      14.    Silver Ring is liable under 15 U.S.C. § 1125(d)(1) for its registration of digisplint.com. With a bad faith intent to profit from Digisplint's mark, Silver Ring registered a domain name that is identical or confusingly similar to Digisplint's mark, which was distinctive at the time of the registration.

      15.    Despite Silver Ring's liability, Digisplint cannot recover damages. Congress provided that the ACPA "shall apply to all domain names registered before, on, or after the date

- 15 -

of the enactment of [the ACPA], except that damages . . . shall not be available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of [the ACPA]." Anticybersquatting Consumer Protection Act, Pub. L. No. 106-113, § 3010, 113 Stat. 1501, app. 552 (1999). Silver Ring's registration of digisplint.com occurred more than a year prior to the November 29, 1999 enactment date of the ACPA, and there is no evidence that Silver Ring re-registered, trafficked in, or used the domain name after that date. Accordingly damages are unavailable for Silver Ring's violation of 15 U.S.C. § 1125(d)(1).

16.    Digisplint is entitled to injunctive relief. Although Silver Ring claims that it has not renewed its registration of the digisplint.com domain name, and "an injunction is unnecessary when 'there is *no* reasonable expectation that the wrong will be repeated,'" Silver Ring has not satisfied its "heavy burden" in this regard. *See Lyons P'ship*, 243 F.3d at 800 (citations omitted). Accordingly, Silver Ring will be permanently enjoined, pursuant to 15 U.S.C. § 1116, from registering a domain name that is identical or confusingly similar to any mark owned by Digisplint.

### C. Attorney's Fees

17.    Silver Ring has requested its costs, including attorney's fees, related to its copyright infringement claim, pursuant to 17 U.S.C. § 505.[8]

> In deciding whether to award attorneys' fees and costs under § 505, the district court should consider, and make findings with respect to, the following factors. First, the district court should evaluate the motivation of the parties.[9] While a finding of willful infringement or bad faith on the part of the opposing party properly may be considered by the district court, the presence or absence of such motivation is not necessarily dispositive. Second, the district court should weigh the objective reasonableness of the legal and factual positions advanced. The

---

[8] Silver Ring explicitly disclaims any entitlement to its costs and fees related to the jurisdictional contest in the early stages of this case. (*See* Bench Br. 4, Apr. 28, 2008; Reply Br. 6, May 16, 2008.)

[9] The primary motivation to be considered is "the motivation of the party from whom an award of attorney's fees and costs is sought." *Diamond Star Bldg. Corp. v. Freed*, 30 F.3d 503, 506 (4th Cir. 1994).

Case 3:06-cv-00065-NKM-BWC   Document 69   Filed 06/18/08   Page 16 of 18   Pageid#: 428

court may consider, for example, whether the positions advanced by the parties were frivolous, on the one hand, or well-grounded in law and fact, on the other. Third, the court should consider "the need in particular circumstances to advance considerations of compensation and deterrence." In evaluating this factor, the court may find relevant, among other circumstances, the ability of the non-prevailing party to fund an award. Finally, these enumerated factors are not intended as an exhaustive list; the district court may also weigh any other relevant factor presented.

*Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 234 (4th Cir. 1993) (citations omitted).

18.     With respect to the first factor, Digisplint has not acted in good faith. First, Digisplint's infringement was willful. Second, as discussed below, much of Digisplint's defense was objectively unreasonable. Nevertheless, Silver Ring engaged in good faith settlement negotiations and even sought mediation before the magistrate judge. Yet Digisplint persisted in disputing liability, unreasonably increasing the litigation costs to both parties. Moreover, Digisplint continued its infringement for at least a year after this suit was filed, and at least several months after the Court's jurisdiction over Digisplint was established.

19.     As to the second factor, the evidence of copying in Digisplint's October 2006 website was so obvious, pervasive, and overwhelming that it was objectively unreasonable for Digisplint to dispute its liability for copyright infringement. Indeed, Digisplint's defense in this regard may be fairly characterized as frivolous. Moreover, the majority of Digisplint's defense to both liability and damages was focused on showing that its infringement—though it did not concede that there was any infringement—was innocent. However, not only is "innocent infringement" not a defense to liability, it also does not mitigate damages where, as was clearly the case here, the infringed work displays a proper notice of copyright. 17 U.S.C. § 401(d).

20.     With respect to the third factor, although Digisplint claims that it is unable to pay an award of attorney's fees, its allegations of poverty do not reduce the costs of this litigation that could have been avoided but for the unreasonable positions it has taken. Moreover, the

Case 3:06-cv-00065-NKM-BWC   Document 69   Filed 06/18/08   Page 17 of 18   Pageid#: 429

imposition of costs and fees in this case furthers the goal of deterring a party from needlessly increasing litigation costs by advancing unreasonable and frivolous defenses.

21.     Although the enumerated factors all favor an award of costs and fees, it is significant that Digisplint's positions on issues unrelated to copyright infringement, such as personal jurisdiction and cybersquatting, were decidedly reasonable. Accordingly, Silver Ring's costs and attorney's fees will be awarded only for those incurred directly in pursuit of its copyright infringement claim.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, I will (1) render judgment in favor of Silver Ring on the claim of copyright infringement, award statutory damages in the amount of $30,000, plus Silver Ring's related costs and attorney's fees, and permanently enjoin Digisplint from infringing Silver Ring's copyrights; (2) dismiss Digisplint's claim under Va. Code § 8.01-40; and (3) render judgment in favor of Digisplint on the counterclaim of cybersquatting and permanently enjoin Silver Ring from registering a domain name that is identical or confusingly similar to any mark owned by Digisplint. An appropriate Judgment Order will follow.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this _18th_ day of June, 2008.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

- 18 -